**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-4830-18
                          A-4831-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JASON A. DOTTS, III,
a/k/a JASON A. DOTTS, SR.,
and JASON DOTTS, III,

     Defendant-Appellant.

_____

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JAMES L. DOTTS, III,
a/k/a JAMES DOTTS,

     Defendant-Appellant.

_____

Submitted March 30, 2022 – Decided September 1, 2022

Before Judges Messano and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 17-03-0358.

Joseph E. Krakora, Public Defender, attorney for appellant Jason A. Dotts, III (Richard Sparaco, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant James L. Dotts, III (Michael A. Priarone, Designated Counsel, on the brief).

Lori Linskey, Acting Monmouth County Prosecutor, attorney for respondent (Carey J. Huff, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the briefs).

PER CURIAM

In these back-to-back appeals, which have been consolidated for the purpose of writing one opinion, defendants Jason A. Dotts and James L. Dotts, III, twin brothers,[1] challenge their convictions and sentences following a joint jury trial on charges of second-degree robbery, N.J.S.A. 2C:15-1; second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); and conspiracy to commit robbery,

---

[1] Although both defendants bear the suffix, "III," in the record, only one defendant would be named after his father. Because James L. Dotts was referenced with the suffix, whereas Jason A. Dotts was referenced without it in the first transcript in the record, we adopt these designations in this opinion. Also, because defendants share the same surname, we refer to them by their first names for convenience of the reader. We intend no disrespect by employing this informality.

N.J.S.A. 2C:5-2(a)(1). Prior to trial, their co-defendant, Ramel Kirkpatrick, who was similarly charged, pled guilty to third-degree conspiracy to commit aggravated assault, N.J.S.A. 2C:5-2 and 2C:12-1(b), and agreed to testify for the State, in exchange for the dismissal of the remaining charges and the State recommending he receive a sentence of 364 days in jail and a probationary term. We affirm in all respects in both appeals.

I.

In 2016, John Hessian lived two doors away from defendants' mother in the same apartment complex in Long Branch. He had known defendants for approximately three or four years.

Hessian was wounded in combat while serving in the United States Army and later suffered from physical and mental health issues. Therefore, he qualified for social security disability benefits. On the third day of each month, Hessian would go to the bank and withdraw his disability payments. On November 3, 2016, he went to the bank, withdrew his disability payment, paid some bills with money orders and kept the remaining cash — approximately $350 — in his wallet.

When he returned home, Hessian saw defendants outside their mother's apartment. Jason asked Hessian for five dollars, although he previously had not

asked Hessian for money. Hessian opened his wallet and gave Jason the five dollars. Jason asked if he could come to Hessian's apartment later for help with some insurance paperwork. Hessian did not have a background in insurance but agreed to the favor. While the men stood together, James also asked Hessian for five dollars. Hessian again opened his wallet and gave James four singles, because Hessian "only had larger bills."

At approximately 9:30 p.m. that evening, while Hessian was watching television, defendants and Kirkpatrick came to his apartment. According to Hessian, Kirkpatrick was standing by the front door, James was to Hessian's left, and Jason to his right. Hessian began to look over Jason's insurance paperwork and at some point, defendants' mother came to Hessian's front door. Defendants briefly exited the apartment to speak with their mother before returning to Hessian's apartment.

Hessian does not recall what happened next, other than he woke up alone on the floor of his apartment, near a chair where he had been sitting. He was covered in blood and felt groggy. Hessian could not find his cell phone, so he used a backup phone to call 911 and report he was "beaten up." The 911 call was played for the jury.

Detective Nicholas Romano and another officer were among the first to respond to the scene. They found Hessian bleeding, and blood spattered in various areas of the apartment. Hessian informed the detective that defendants and another man were in his apartment earlier, but he could not remember who assaulted him.

Emergency medical personnel transported Hessian to the hospital, where he was diagnosed with significant injuries, including facial fractures, a concussion, and a brain bleed. He remained hospitalized for a week before he was discharged to a rehabilitation facility.

Fifteen days after the attack, Hessian returned home via ambulance. He was wearing two hospital gowns because his "clothes were blood soaked." Jason was outside Hessian's apartment and asked Hessian "how [he] was." Jason also told Hessian "he could get [him] $300," despite that Hessian never told anyone but the police how much money was taken from his wallet on November 3. The following day, defendants' mother and two other family members visited Hessian to talk "about what happened to" him.

Based on Hessian's initial conversation with Detective Romano, defendants and Kirkpatrick became suspects. Subsequently, Hessian met with

A-4830-18

another detective for a photo array and identified Kirkpatrick as the third individual who was in his apartment on the night of the incident.[2]

Detective Romano and another officer interviewed James at police headquarters the day after the attack. Once James was Mirandized,[3] he admitted speaking with Hessian on November 3 but denied assaulting or robbing him, or being present during the attack. James also said he did not remember having a conversation with his mother outside of Hessian's apartment the previous evening because he "was drunk."

As the interview continued, James recalled his mother was "hollering at Jason" and called defendants out of Hessian's apartment on the night of November 3 after hearing Jason accepted money from Hessian. James later stated he believed Kirkpatrick "probably hit" Hessian but he "didn't see" the assault because he was looking at a sports magazine Hessian had or was watching television. Eventually, when he was asked whether Kirkpatrick hit Hessian, James answered, "Yeah." James also claimed he cursed and left Hessian's apartment after Kirkpatrick hit Hessian.

---

[2] The photo array was videotaped and the recording was played for the jury at trial.

[3] See Miranda v. Arizona, 384 U.S. 436 (1966).

A-4830-18

During the interview, Detective Romano referred to James's municipal job and told him it would not "look good for work" if James was involved in the incident or was "hiding information." James denied he was lying, then said he "wasn't there" when Hessian was attacked. But he also stated he thought Kirkpatrick hit Hessian, and he did not "know why [Kirkpatrick] did it."

After some additional questioning, Detective Romano asked James, "[y]ou want to keep doing this?" James responded, "No, I'm ready to go." "I got to go get my check, . . . go eat, take a shower." Nevertheless, the police continued questioning James and he advised the officers he did not see Kirkpatrick hit Hessian, but "just kn[e]w he did." James also stated Kirkpatrick probably "took something as he was looking around."

Detective Romano and another officer interviewed Jason two days after the attack. By then, Jason had been arrested on a complaint the detective signed against both defendants for endangering an injured victim. Once Jason was photographed and fingerprinted, he executed a form acknowledging his <u>Miranda</u> rights and agreed to speak to the police. Detective Romano informed him he was being questioned "because there was an incident . . . where . . . [his] mom's house is." Jason admitted he was in Hessian's apartment on November 3, but he claimed he met with Hessian for help with his insurance paperwork. Jason

initially denied any knowledge of the assault, except what he heard from his mother. Detective Romano warned Jason he could "be charged additionally with . . . a robbery and an aggravated assault," adding, "I know you know more about it."

As the interview progressed, Jason admitted he was in Hessian's apartment with James during the attack. Jason claimed Kirkpatrick "kick[ed] the door in," entered Hessian's apartment, and hit Hessian "in the face," causing Hessian to fall. According to Jason, Kirkpatrick was "so drunk that he was . . . just punching" Hessian and Hessian "was knocked out." According to Jason, once this happened, he "got [his insurance] paperwork" and left. He admitted Hessian was on the ground bleeding at that point. Jason said he "didn't know [Kirkpatrick] was gonna do that."

Kirkpatrick was interviewed by the police approximately three weeks after defendants were interviewed. He denied being in Hessian's apartment on November 3 and claimed defendants were lying when they said he was.

II.

Defendants were indicted in 2017. Prior to trial, the State requested an N.J.R.E. 104(c) hearing to address the admissibility of defendants' statements to

the police.  Neither defendant moved to suppress his statement before the hearing.

At the 104 hearing, James's attorney requested the latter portion of his client's statement to Detective Romano be suppressed, specifically that portion following the words, "I got to go get my check, . . . go eat, take a shower."  The State conceded Detective Romano should have ceased interrogating James when he made this equivocal statement so the detective could determine whether James wanted the interview to end.

Following argument, the judge found James "clearly understood . . . and acknowledged . . . his rights under Miranda" and "was not under any duress or coercion" during his interrogation.  But the judge concluded Detective Romano "should have stopped . . . and questioned the defendant to determine whether . . . he was seeking to invoke his Miranda rights" after indicating he was "ready to go."[4]  Thus, the judge found only that portion of James's statements preceding

---

[4] See State v. Harvey, 151 N.J. 117, 221 (1997) (quoting State v. Johnson, 120 N.J. 263, 284 (1990)) ("If police are unsure whether a defendant is asserting his [or her] right to silence, they must either stop the interrogation completely or 'ask only questions narrowly directed to determining whether defendant [is] willing to continue.'")  "Such questioning is not considered 'interrogation' under Miranda, because it is not intended to 'elicit an incriminating response from the suspect.'"  Johnson, 120 N.J. at 283 (quoting Christopher v. Florida, 824 F.2d 836, 842 n.16 (11th Cir. 1987)).

his telling the detective he needed to "go get [his] check, . . . go eat, [and] take a shower" was admissible.

As the 104 hearing continued, the State questioned Detective Romano about Jason's custodial interview. Notably, when the testimonial hearing ended, Jason's attorney lodged no objection to the admission of Jason's statement. The judge found that once Jason was <u>Mirandized</u>, there was "no indicia . . . [of] any coercion, duress, or any other untoward circumstance" during the interview, and Jason appeared "anxious . . . to speak to the officer." The judge concluded the statement was admissible, finding "beyond a reasonable doubt, the statement was completely voluntary."

III.

In March 2018, defendants proceeded to trial. The trial ended in a hung jury and the judge declared a mistrial. In June 2018, James moved to have the entirety of Kirkpatrick's out-of-court statement to police deemed admissible. Jason joined in the motion. Citing N.J.R.E. 613(b),[5] the judge ruled Kirkpatrick

---

[5] N.J.R.E. 613(b) provides, in part,

> [e]xtrinsic evidence of a witness' prior inconsistent statement may be excluded unless the witness is afforded an opportunity to explain or deny the statement and the opposing party is afforded an

could only be impeached with the portions of his statement that were inconsistent with his trial testimony, "[i]f and when . . . Kirkpatrick testifie[d]."

IV.

A second trial commenced in March 2019. In anticipation of Hessian testifying about defendants' family and friends approaching him after the assault, James moved to bar this testimony. Jason joined in the motion. The judge denied the application, explaining:

> I think it is relevant that the . . . victim be able to testify that he was approached by these individuals at whatever point in time after he came home from the hospital. I don't think . . . the State should ask the victim on direct examination, how that made him feel.
>
> . . . .
>
> But I'm going to rule that . . . those conversations in the victim's apartment after he returns home from the hospital are admissible on direct examination . . . .

James's counsel also sought to preclude Hessian from testifying extensively about his injuries from his military service. She stated, "we know he is a disabled military veteran. I don't have any objection to informing the

---

opportunity to interrogate on the statement, or the interests of justice otherwise require. This rule does not apply to admissions of a party opponent as defined in Rule 803(b).

jury of that. . . . I would ask that he be limited to . . . he was in the military, . . . he was wounded. . . . But maybe just a little bit less tugging at the heart strings." (Emphasis added). In response, the assistant prosecutor agreed to limit her questioning but stated she would seek to elicit Hessian was "a wounded military veteran and . . . on disability, that he receives disability checks" and "he gets disability . . . because of his military service." The judge stated he would "allow that," noting Hessian's disabilities were "obvious to the lay person."

Following this ruling, Hessian testified. He stated he received social security disability benefits for psychiatric reasons, some of which were the result of his military service. Hessian also confirmed he served in the Army for eight years and was wounded in combat. Further, he affirmed he received disability benefits once a month.

During Hessian's cross-examination, he told each defense attorney he did not know who assaulted him. Significantly, neither counsel confronted Hessian during cross-examination about statements he made to defendants' investigator, Ivan Mendez, specifically that Hessian believed neither James nor Jason assaulted or robbed him. The State conducted no redirect examination.

James's attorney proceeded with recross-examination and asked Hessian, "do you recall speaking with an investigator from my law office?" The State

12

objected, arguing this question was outside the scope of cross-examination. James's counsel responded that Hessian told her investigator "something different from what he just testified to." The judge asked James's counsel to "make a proffer," at which point she offered to "go get the [investigator's] report." The judge responded, "[w]hat's the inconsistency that is within the scope?" James's attorney stated Hessian had just testified that

> he wasn't aware . . . any money was missing until the police told him so. That is different from what he told my investigator. He said . . . he had no idea who hit him, which is different from what he told my investigator, which was that he was confident that James or Jason did not assault him.

The State highlighted that Hessian made the same representations when James's counsel initially cross-examined him. The judge asked James's counsel, "why didn't you confront him with this on cross-examination?" She answered, "I expected [Jason's attorney] to bring it up." The judge informed counsel he would reserve on the evidentiary issue but "[i]n the meantime, [James's counsel could] cross-examine [Hessian] on inconsistencies brought out on . . . cross-examination [by Jason's attorney]."

The next day, James's attorney reprised her argument about using Mendez's report. She argued the judge had permitted the State to ask Hessian about defendants' family and friends visiting him after the assault because the

State had expected Mendez to testify for the defense. Further, she claimed the judge precluded her the previous day from retrieving Mendez's report when he asked her for a proffer. The judge ruled defense counsel should not be allowed to conduct recross-examination beyond the scope of cross-examination to address how Hessian's testimony may have differed from statements provided to Mendez. Turning to James's attorney, the judge stated,

> you had full and lengthy cross-examination . . . [and Hessian] indicated . . . that he didn't know who assaulted him. You had the investigator's report. You could have cross-examined him with the report at that time.
>
> As far as the sidebar is concerned, I have no recollection of restricting you from going and getting the [investigator's] report. I remember you offering me the opportunity to read the report. . . . I don't have to read the report. I . . . ask[ed] you for an offer of proof . . . .
>
> . . . .
>
> Recross-examination is not a reopening of your entire cross-examination. There are Court Rules. Recross-examination is not a function of asking anything you want for as long as you want with no rules.

When testimony resumed, the State called Dr. Sharon Weiner to testify about the extensive injuries Hessian suffered after he was assaulted. It also called Kirkpatrick to testify. Kirkpatrick admitted he went to Hessian's

A-4830-18

apartment twice on the evening of November 3. He stated when he first went to the apartment, defendants' mother came to the door and started "screaming for [the trio] to get out." Kirkpatrick recalled that the three men left Hessian's home but returned thereafter because Jason announced he wanted to rob Hessian and asked Kirkpatrick to join him.

According to Kirkpatrick, when the three men went back to Hessian's apartment, Hessian was standing in the middle of the living room, James was in front of Hessian with magazines in his hand, and Jason was behind Hessian "pacing." Kirkpatrick claimed he remained standing by the front door and saw Jason strike Hessian, causing Hessian to fall to the floor. When Kirkpatrick saw Hessian was "already down," he assumed Jason no longer "need[ed his] assistance," and left. Kirkpatrick stated he did not see anyone take money or a cell phone from Hessian but "Jason came back and . . . gave [him] $50."

During Kirkpatrick's cross-examination, excerpts from his recorded police statement were played for the jury. The excerpts included Kirkpatrick's denial he was in Hessian's apartment on November 3, as well as his statement that defendants were lying when they said he was present for the attack. Kirkpatrick acknowledged his excerpted statements to the police were not true. Further, he

admitted he cooperated with the State and negotiated a plea bargain "to avoid the . . . harshest of penalties."

Following Kirkpatrick's testimony, Detective Romano testified. The detective described the condition of Hessian and his apartment in the immediate aftermath of the assault. The detective also testified about his interviews with defendants and described how Hessian identified Kirkpatrick during a photo array conducted by another detective. While the detective was on the stand, the State played portions of defendants' recorded interviews for the jury.

As Detective Romano's direct examination continued, the State also played footage from a surveillance video taken across the street from Hessian's apartment. The detective explained how the footage depicted the movement of individuals between the apartments of Hessian and defendants' mother on November 3. For example, he confirmed three individuals left Hessian's apartment at approximately 9:54 p.m. that night and no one else went in or out of the victim's apartment until a police officer arrived there at approximately 10:07 p.m.

When cross-examined by James's counsel, the detective admitted the faces, race and gender of the individuals seen on the surveillance footage could not be discerned. Also, during recross-examination by James's counsel, the

A-4830-18

detective conceded "Jason's insurance paperwork was not found in [Hessian's] apartment."  The following exchange occurred:

> [JAMES'S COUNSEL]:  And Jason told you to your face he picked up his paperwork and left after [Kirkpatrick] assaulted [Hessian], correct?
>
> [DETECTIVE ROMANO]:  Correct.
>
> [JAMES'S COUNSEL]:  So, it's not surprising that his paperwork wasn't there.
>
> [DETECTIVE ROMANO]:  They told me a lot of stories.
>
> [JAMES'S COUNSEL]:  Okay.  But if Jason said he took [the paperwork] with him, then you wouldn't expect to find it in the apartment; is that fair?
>
> [DETECTIVE ROMANO]:  No.  They told me a lot of different stories . . . from the beginning.  If he told me that he took it after an hour's worth of essentially lying to me, no, I wouldn't believe that he would have taken his paperwork; or I could . . . safely say he might not be telling me the truth.

Neither defendant objected to this testimony and the Stated rested shortly thereafter.

Subsequently, the judge barred Mendez from directly testifying about inconsistent statements made by Hessian, again noting defense counsel failed to confront Hessian with those statements during his cross-examination.  Once

17

defendants were sworn in and affirmed they did not wish to testify, the defense rested without calling any witnesses.

The judge conducted a charge conference with counsel and adopted some, although not all, of the revisions they proposed. Following summations, the judge held another charge conference, charged the jury, and released jurors for the day. At that point, James's counsel lodged an objection pertaining to the accomplice liability charge and asked the judge to modify the charge. The judge denied the request, stating, "I can't do that now. We . . . already had summations. I have already charged the jury."

The next day, the judge addressed the renewed request of James's counsel to modify the accomplice liability charge. Jason's attorney joined in the request. After hearing further argument, the judge stated he "disagree[d] with the defense's position on this," but "out of an abundance of caution," he granted the defense's belated request to modify the charge. Both defense attorneys represented the modified charge was acceptable to them before the judge read it to the jury. None of the attorneys subsequently objected to this final charge.

Shortly after jury deliberations began, the jury sent a series of notes out to the court. In one note, the jury asked, "Is the third charge simply a charge of conspiracy to commit any crime or a charge of conspiracy to commit a robbery?"

18

It also asked, "Is the conspiracy charge to 'commit a robbery' the indictable offense because of the fact that someone was assaulted during the incident?"

Regarding the first question, the judge told the jury, "the third charge is a charge of conspiracy to commit a robbery." He asked jurors to rephrase the second question, and when they complied, they posed the question, "Is the charge for conspiracy to commit a robbery the charge because of the fact that there was an assault involved or could there have been a lesser[-]included charge of conspiracy to commit a theft?" James's attorney inquired, "Should we tell them that there is no lesser charge of conspiracy to commit theft? I mean, robbery is theft with an aggravated assault." In response, the judge said he would refer the jury to the robbery definition given in his charge; James's attorney replied, "Okay." After the judge instructed the jury as he said he would, neither attorney for the defense sought to have the judge charge the jury on conspiracy to commit theft.

The next day, the judge accommodated the jurors' request to replay an enlarged version of the surveillance video. Shortly thereafter, the jury acquitted defendants of robbery but found them guilty of theft, aggravated assault, and conspiracy to commit robbery.

A-4830-18

At sentencing, the judge determined defendant were persistent offenders, pursuant to N.J.S.A. 2C:44-3(a).[6] He sentenced them to extended fifteen-year prison terms on their assault convictions, subject to an eighty-five percent parole ineligibility period under the No Early Release Act, N.J.S.A. 2C:43-7.2(c) (NERA). Further, the judge imposed seven-year terms, subject to NERA, on their conspiracy convictions, and four-year terms for their theft offenses, with all terms to run concurrent to one another.

V.

On appeal, Jason raises the following arguments for our consideration:

POINT I

---

[6] N.J.S.A. 2C:44-3(a) provides, in part:

> A persistent offender is . . . [someone who] is [twenty-one] years of age or over, who has been previously convicted on at least two separate occasions of two crimes, committed at different times, when . . . at least [eighteen] years of age, if the latest in time of these crimes or the date of the defendant's last release from confinement, whichever is later, is within [ten] years of the date of the crime for which the defendant is being sentenced.

If these criteria are met, a person convicted of a second-degree crime, such as aggravated assault, may be sentenced to a term of between ten and twenty years. N.J.S.A. 2C:43-7(a)(3).

A-4830-18

THE DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE TO THE COURT'S ADMISSION INTO EVIDENCE OF HIS STATEMENT TO DETECTIVES IN VIOLATION OF HIS <u>MIRANDA</u> RIGHTS BECAUSE HE WAS NOT ADVISED OF THE CHARGES HE WAS FACING.

POINT II

DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE TO THE COURT'S REFUSAL TO INSTRUCT THE JURY ON THE LESSER-INCLUDED OFFENSE OF CONSPIRACY TO COMMIT THEFT.

POINT III

THE DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE TO UNDUE PREJUDICE CAUSED BY THE ADMISSION OF EVIDENCE THAT MEMBERS OF THE DEFENDANT'S FAMILY ATTEMPTED TO CONTACT THE VICTIM UPON HIS RETURN FROM THE HOSPITAL. (PARTIALLY RAISED BELOW).

    A.   THE FIRST PRONG UNDER <u>COFIELD</u>[7] WOULD NOT HAVE BEEN MET.

    B.   THE THIRD PRONG UNDER <u>COFIELD</u> WOULD NOT HAVE BEEN MET.

    C.   THE FOURTH PRONG UNDER <u>COFIELD</u> WOULD NOT HAVE BEEN MET.

---

[7] <u>State v. Cofield</u>, 127 N.J. 338 (1992).

A-4830-18

POINT IV

THE DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE TO UNFAIR AND INADMISSIBLE EVIDENCE DESIGNED TO EXTRACT SYMPATHY FOR THE VICTIM DUE TO HIS PRIOR MILITARY SERVICE AND MILITARY INJURIES.

POINT V

THE DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE TO IMPROPER OPINION TESTIMONY BY THE INTERROGATING DETECTIVE THAT THE DEFENDANT WAS NOT TELLING THE TRUTH.

POINT IV

THE SENTENCE WAS EXCESSIVE BECAUSE THE COURT FAILED TO UTILIZE THE CORRECT RANGE OF SENTENCE WHEN SENTENCING A DEFENDANT TO A DISCRETIONARY EXTENDED-TERM.  (NOT RAISED BELOW).

James raises the following contentions for our consideration:

POINT I

DEFENDANT'S STATEMENT TO POLICE SHOULD HAVE BEEN SUPPRESSED AS INVOLUNTARY AND ITS ERRONEOUS ADMISSION INTO EVIDENCE AGAINST DEFENDANT AT TRIAL DEPRIVED DEFENDANT OF DUE PROCESS AND HIS FIFTH AMENDMENT RIGHTS IN VIOLATION OF THE UNITED STATES AND NEW JERSEY CONSTITUTIONS.

POINT II

THE TRIAL COURT DENIED DEFENDANT A FAIR TRIAL BY BARRING CROSS[-]EXAMINATION OF MR. HESSIAN WITH HIS PRETRIAL STATEMENT TO A DEFENSE INVESTIGATOR THAT HE DID NOT BELIEVE THAT THE DEFENDANTS HAD ASSAULTED HIM, BY PRECLUDING THE TESTIMONY OF DEFENDANT'S INVESTIGATOR REGARDING MR. HESSIAN'S PRE-TRIAL STATEMENT AND IN PRECLUDING DEFENDANT FROM INTRODUCING INTO EVIDENCE MR. KIRKPATRICK'S ENTIRE POLICE STATEMENT AS INCONSISTENT WITH HIS TRIAL TESTIMONY.

POINT III

THE VERDICTS ARE INCONSISTENT AND REQUIRE THAT DEFENDANT'S CONVICTION AND SENTENCE BE VACATED AND THE CASE REMANDED FOR A NEW TRIAL BECAUSE THEY RESULTED FROM THE COURT'S ERRONEOUS REFUSAL TO ALLOW THE JURY TO CONSIDER THE LESSER INCLUDED OFFENSE OF CONSPIRACY TO COMMIT THEFT ON THE COUNT CHARGING CONSPIRACY TO COMMIT ROBBERY.

POINT IV

THE ADMISSION OF TESTIMONY THAT THE ALLEGED VICTIM, MR. HESSIAN, WAS A "COMBAT WOUNDED" DISABLED VETERAN AND THE STATE'S ARGUMENT THAT THE DEFENDANTS OCCUPIED A "POSITION OF TRUST" AS TO MR. HESSIAN WAS A MIS-STATEMENT OF LAW, IRRELEVANT TO ANY

23

ISSUE, ENGENDERED PREJUDICE AGAINST DEFENDANT AND REQUIRES THAT DEFENDANT BE GRANTED A NEW TRIAL. (NOT RAISED BELOW).

POINT V

CUMULATIVE ERROR DEPRIVED DEFENDANT OF A FAIR TRIAL AND REQUIRES THAT DEFENDANT'S CONVICTION AND SENTENCE BE REVERSED. (NOT RAISED BELOW).

POINT VI

DEFENDANT'S FIFTEEN[-]YEAR NERA SENTENCE IS EXCESSIVE AND BASED ON THE COURT'S ERRONEOUS DOUBLE[-]COUNTING OF DEFENDANT'S STATUS AS A "PERSISTENT OFFENDER" AND AGGRAVATING FACTORS SIX AND NINE AND THE GROSS DISPARITY OF THE COOPERATING CO-DEFENDANT'S COUNTY JAIL SENTENCE.

These arguments are unavailing.

Defendants' Point I Arguments

Initially, defendants urge us to conclude the trial court erred by granting the State's motion to admit defendants' statements to the police because Jason was not advised of the charges against him prior to his interview and because the police told James in his interview it would not "look good for work" if his employer found out James was involved in the incident or was "hiding information." We are not convinced.

24

Our scope of review of a trial court's decision on a motion to suppress a defendant's custodial statement to police is limited. When reviewing the grant or denial of a motion to suppress a custodial statement, "we defer to the factual findings of the trial court if those findings are supported by sufficient credible evidence in the record." State v. Sims, 250 N.J. 189, 210 (2022) (citing State v. S.S., 229 N.J. 360, 374 (2017)). But we review a trial court's legal conclusions de novo. S.S., 229 N.J. at 380 (citing State v. Morrison, 227 N.J. 295, 308 (2016)).

After receiving Miranda warnings, a suspect may knowingly and intelligently waive his or her right to remain silent and agree to answer questions or make a statement. State v. Puryear, 441 N.J. Super. 280, 292 (App. Div. 2015) (citing Miranda, 384 U.S. at 479). The State must establish beyond a reasonable doubt that the waiver was intelligent, voluntary and knowing. Ibid. (citing State v. Nyhammer, 197 N.J. 383, 400-01 (2009)). Although the suspect is always free to waive the privilege and make a statement, the waiver must never be the product of police coercion. State v. Presha, 163 N.J. 304, 313 (2000) (citing State v. Hartley, 103 N.J. 252, 260 (1986)). "At the root of the inquiry is whether a suspect's will has been overborne by police conduct." Ibid.

A-4830-18

A court typically considers the totality of the circumstances when deciding whether an interrogee has knowingly, intelligently, and voluntarily waived his or her right against self-incrimination while in custody. Nyhammer, 197 N.J. at 402-03 (citing State v. Magee, 52 N.J. 352, 374 (1968)). In State v. A.G.D., our Supreme Court held that a Miranda waiver is invalid if the police fail to advise an interrogee a criminal complaint has been filed or an arrest warrant has been issued against the interrogee. 178 N.J. 56, 58-59 (2003). However, the Court also recently made clear it is unnecessary for police officers to "speculate about additional charges that may later be brought or the potential amendment of pending charges." Sims, 250 N.J. at 214 (citing Nyhammer, 197 N.J. at 404-05).

As we have mentioned, Jason did not seek suppression of his statement at the 104 hearing. Further, his attorney utilized Jason's statement in summation to support the theory Kirkpatrick assaulted Hessian. And during James's 104 hearing, James's attorney requested that only the portion of James's statement following his equivocal comments about needing to "go eat, take a shower" be deemed inadmissible. Thus, because defendants did not seek suppression of their statement on the grounds now raised on appeal, we review their Point I contentions for plain error. R. 2:10-2. Such an error will not be grounds for

reversal unless it was clearly capable of producing an unjust result. State v. J.R., 227 N.J. 393, 417 (2017) (citing R. 2:10-2).

We need not discuss at length Jason's novel contention that his statement to the police should have been suppressed because he was not advised by police about the charges he might face before he waived his Miranda rights. Given the Court's recent controlling opinion in Sims and the totality of the circumstances involved in Jason's interrogation, we are satisfied the judge correctly found the State met its burden in proving Jason's statement to the police was knowing and voluntary, and therefore admissible.

Similarly, we conclude James's Fifth Amendment rights were not violated when the police asked if he thought he would keep his municipal job if his employer found out he was "lying or . . . not telling [the police] something."

Law enforcement officers may not attach a penalty to a public employee's exercise of the right to remain silent through the threat of dismissal. State v. Lacaillade, 266 N.J. Super. 522, 528 (App. Div. 1993). Thus, the use of statements obtained under the threat of removal from office, whether policemen or "other members of our body politic," is prohibited in subsequent criminal proceedings. Garrity v. New Jersey, 385 U.S. 493, 500 (1967). But "[f]ear that loss of employment will result from the exercise of the constitutional right to

remain silent must be subjectively real and objectively reasonable." Lacaillade, 266 N.J. Super. at 528.  Thus, "the defendant must have subjectively believed . . . he [or she] was compelled to give a statement upon threat of loss of job.  Second, this belief must have been objectively reasonable at the time the statement was made."  Ibid. (quoting United States v. Camacho, 739 F. Supp. 1504, 1515 (S.D. Fla. 1990)).

Here, there is nothing in the record to indicate the Long Branch police had the authority or power to discharge or recommend discharge of non-law enforcement municipal employees.  Thus, even if James subjectively believed he would be discharged from his municipal position if he was not more forthcoming, this belief was not "objectively reasonable," and the fact Detective Romano may have engaged in speculation to persuade James to be more candid did not eliminate the voluntariness of James's consent.  Cf. State v. Hagans, 233 N.J. 30, 42 (2018) (alteration in original) (quoting State v. Cancel, 256 N.J. Super. 430, 434 (App. Div. 1992)) ("An officer's comment regarding the inevitability of a search warrant does not indicate coercion if it is 'a fair prediction of events that would follow' rather than 'a deceptive threat made to deprive [an individual] of the ability to make an informed consent.'").

It also is worth noting that between the time Detective Romano inquired about James's job and James's equivocal statement about leaving the interview, statements of possible import appear limited to James telling the police he thought Kirkpatrick hit Hessian, but he did not see Kirkpatrick do so. Thus, any error arising from the detective's speculation was not clearly capable of producing an unjust result.

James's Point II Argument

James next argues his attorney should have been permitted to cross-examine Hessian about prior inconsistent statements made to Investigator Mendez, and Mendez should have been allowed to testify that Hessian told him he didn't think either defendant assaulted him on November 3. Further, James reprises his contention he should have been allowed to introduce into evidence the entirety of Kirkpatrick's statement to the police. We are not convinced.

Generally, evidentiary rulings are within the trial court's discretion and will not be reversed on appeal absent a clear abuse of that discretion. State v. McGuire, 419 N.J. Super. 88, 123 (App. Div. 2011) (citing Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 382 (2010)). It follows, then, that the scope of cross-examination is within the sound discretion of the trial court, the exercise of which will not be disturbed unless clear error and prejudice are

shown.  State v. Adames, 409 N.J. Super. 40, 61 (App. Div. 2009) (quoting Glenpoint Assocs. v. Twp. of Teaneck, 241 N.J. Super. 37, 54 (App. Div. 1990)).

Under N.J.R.E. 611(b), cross-examination "should not go beyond the subject matter of the direct examination and matters affecting witness credibility."  Here, the judge denied James the opportunity on recross-examination — not cross-examination — to question Hessian about his statement to Mendez that he didn't believe defendants assaulted him, after testifying he didn't know who assaulted him.  We discern no abuse of discretion in this regard, considering:  both defense attorneys failed to ask Hessian on cross-examination if he told Mendez he didn't believe defendants assaulted him; there was no redirect on the part of the State after both attorneys extensively cross-examined Hessian; and James's attorney admitted to the judge she expected Jason's attorney to question Hessian about the victim's statements to Mendez.  It also is well established that questions of defense counsel trial strategy and motives, as well as errors of counsel as a basis for reversal of a conviction, are normally deferred to a petition for post-conviction relief, and not resolved on direct appeal.  State v. Preciose, 129 N.J. 451, 462 (1992) (quoting State v. Sparano, 249 N.J. Super. 411, 419 (App. Div. 1991)).

Turning to James's argument the judge erred in barring Mendez from testifying about Hessian's purported inconsistent statements to the investigator, we again disagree. Initially, we note the judge did not bar all testimony from Mendez. Instead, the judge disallowed Mendez from testifying about Hessian's purported prior inconsistent statements. He explained:

> The issue here is whether or not the defense should be permitted to call Mr. Mendez as a witness to testify to the contents of that statement which, as I understand it, is a summary of a statement, not a question and answer statement, not having been reviewed by the victim, Mr. Hessian, not having been signed, reviewed, corrected, as a formal statement but as a summary by Mr. Mendez.

The judge quoted the applicable text of N.J.R.E. 613(b) to counsel and stated:

> So, . . . had Mr. Hessian been confronted with the allegations contained in the statement prepared by Mr. Mendez and been given the opportunity to say I either did or didn't say those things to Mr. Mendez, perhaps Mr. Mendez would have been able to testify to the circumstances surrounding the statement taking; but without having confronted Mr. Hessian with that statement, it would seem to me that Rule 613(b) precludes the admission of that statement.
>
> Therefore, testimony regarding that statement is inadmissible.

The judge's reasoning here was sound. Accordingly, we detect no basis to second-guess his evidentiary ruling. Although Hessian's statement to Mendez is not contained in the record, it is clear to us, as the judge noted, defendants'

A-4830-18

attorneys had Mendez's report and could have used it to cross-examine Hessian about what he said to Mendez. They simply did not do so.

James next argues the judge erred in barring the defense from playing Kirkpatrick's entire police statement for the jury, and by limiting the defense to cross-examining Kirkpatrick about statements he made to the police which were inconsistent with his testimony at trial. According to James, the entire police statement should have been shown to the jury so it could assess Kirkpatrick's "demeanor and manner when lying and assess his credibility at trial in that light." We do not agree.

"Hearsay is an out-of-court statement 'offered in evidence to prove the truth of the matter asserted.' N.J.R.E. 801(c). It is inadmissible absent an exception to the rule against hearsay. N.J.R.E. 802. N.J.R.E. 803(a)(1) governs the admissibility of witnesses' prior inconsistent statements." State v. Baluch, 341 N.J. Super. 141, 178 (App. Div. 2001). "To be admissible under N.J.R.E. 803(a)(1), a prior statement offered by an adversary of the party calling the witness must be inconsistent with testimony given by the witness at the trial or hearing." Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1(b) on N.J.R.E. 803(a)(1) (2022). "For a statement to be admissible under this

Rule it must be offered in compliance with the requirements of N.J.R.E. 613(a) and (b)." Id. at cmt. 1(a).

Here, the judge found that to the extent Kirkpatrick's recorded statement to the police did not contradict the witness's trial testimony, it was inadmissible hearsay. James does not challenge that finding. In fact, he points to no exception to the rule against hearsay that would have permitted the admission of the entire video. Further, the record reflects jurors were able to compare Kirkpatrick's demeanor from portions of his recorded police statement against his demeanor on the stand. Therefore, we detect no reason to conclude the judge erred in barring James from admitting Kirkpatrick's entire statement to police.

Jason's Point II and James's Point III Arguments

Defendants next argue their convictions should be reversed due to the judge's failure to charge the jury on conspiracy to commit theft as a lesser-included offense to conspiracy to commit robbery. James also contends his convictions and sentence should be reversed because the jury reached inconsistent verdicts. We disagree.

Because defendants did not explicitly request the judge to charge conspiracy to commit theft, nor did defense counsel object when the judge failed to sua sponte charge the jury on the offense of conspiracy to commit theft, we

review defendants' jury charge argument under the plain error standard. State v. Montalvo, 229 N.J. 300, 320-21 (2017) (citations omitted).

> [P]lain error requires demonstration of "legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."
>
> [State v. Chapland, 187 N.J. 275, 289 (2006) (quoting State v. Hock, 54 N.J. 526, 538 (1969)).]

A court shall not charge an included offense "unless there is a rational basis for a verdict convicting the defendant of the included offense." N.J.S.A. 2C:1-8(e). An offense is an included offense when:

> (1) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or
>
> (2) It consists of an attempt or conspiracy to commit the offense charged or to commit an offense otherwise included therein; or
>
> (3) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property or public interest or a lesser kind of culpability suffices to establish its commission.
> [N.J.S.A. 2C:1-8(d).]

A trial court should deliver a lesser-included offense instruction sua sponte where the facts in evidence "clearly indicate" the appropriateness of that

charge. State v. Funderburg, 225 N.J. 66, 81 (2016) (quoting State v. Savage, 172 N.J. 374, 397 (2002)). Thus, "[o]nly if the record clearly indicates a lesser-included charge—that is, if the evidence is jumping off the page—must the court give the required instruction." Id. at 81-82 (quoting State v. Denofa, 187 N.J. 24, 42 (2006)). But the court may not sua sponte charge a lesser-included offense where it would "cause complete surprise, or [be] so inconsistent with the defense as to undermine the fairness of the proceedings." State v. Garron, 177 N.J. 147, 181 (2003) (citations omitted).

Theft is a lesser-included offense of robbery, State v. Ingram, 196 N.J. 23, 39 (2008), because robbery has the same elements as theft with the additional requirement of demonstrating that the defendant used force or threatened bodily harm, N.J.S.A. 2C:1-8(d)(3); N.J.S.A. 2C:15-1(a); N.J.S.A. 2C:20-2(b)(2)(d). Thus, "all robberies are thefts, but not all thefts are robberies." State v. Mejia, 141 N.J. 475, 495 (1995) (citations omitted).

"Conspiracy to commit an offense is considered to be a lesser-included offense of the substantive criminal offense . . . ." In re State ex rel. A.D., 212 N.J. 200, 222 (2012) (citing N.J.S.A. 2C:1-8(d)(2)). The difference between conspiracy to commit robbery, a crime against a person, and conspiracy to commit theft, a property crime, is that conspiracy to commit robbery requires

threat of bodily injury or the use of a deadly weapon, while conspiracy to commit theft only requires that the defendant had the purpose of facilitating a theft. N.J.S.A. 2C:15-1(a); N.J.S.A. 2C:20-2(b)(2)(d).

Here, there is no indication in the record, let alone a clear indication, Hessian was a victim of theft versus a robbery, or that defendants and Kirkpatrick conspired to commit a theft. Also, Jason and James maintained Kirkpatrick acted unilaterally in attacking Hessian and each defendant denied having agreed with any co-defendant to steal money from Hessian.

Additionally, the jury asked during deliberations, "Is the charge for conspiracy to commit a robbery the charge because of the fact that there was an assault involved or could there have been a lesser charge of conspiracy to commit a theft?" And James's attorney responded, in part, "Should we tell them . . . there is no lesser charge of conspiracy to commit theft?" Further, after the judge said he would refer jurors back to the definition of robbery he gave in his charge, James's counsel replied, "Okay" and Jason's attorney lodged no objection to the judge's plan. Under these circumstances, the judge was not required to sua sponte charge the jury on conspiracy to commit theft.

We also are not persuaded the jury's inconsistent verdict cannot stand. Indeed, "[o]ur system of justice has long accepted inconsistent verdicts as

beyond the purview of correction by our court[]." State v. Kelly, 201 N.J. 471, 487 (2010) (citing United States v. Powell, 469 U.S. 57, 58 (1984)). "Inconsistent verdicts are accepted in our criminal justice system" so long as the evidence was sufficient to establish guilt on the offenses beyond a reasonable doubt. State v. Banko, 182 N.J. 44, 53-55 (2004) (citations omitted).

Jason's Point III Argument

Next, Jason argues the judge erred in admitting evidence that members of his family contacted Hessian after the victim completed rehabilitation. He contends this evidence should have been excluded as unduly prejudicial under N.J.R.E. 403 and N.J.R.E. 404(b). Again, we disagree.

Prior to the start of trial, James objected to Hessian being able to testify about what defendants' relatives said to him after he was discharged from the rehabilitation facility. The State indicated it would not elicit the details of the conversation but would ask Hessian if these individuals spoke to him. The assistant prosecutor represented:

> I have an indication that Ivan Mendez, the public defender investigator[,] is going to be testifying as a defense witness.
>
> [A]nd so if there is going to be any cross[-]examination about what [Hessian] might have said to Ivan Mendez, the fact that Ivan Mendez is the fifth

person who talks to him on behalf of the defendant, I think is important.

Jason's attorney countered, "the only inference you draw from somebody coming to the house and [asking] how he feels is to suggest it's witness tampering. To somehow connect these two defendants to that conduct now." The judge stated, "I think that . . . [Hessian] was approached by them are facts in the case." James's counsel interjected,

> I don't see how it's relevant and I think that we are doing a preemptive rebuttal here, of Ivan Mendez, and we are leading the jury to believe that I, through my defensive investigator, . . . somehow tampered with witnesses and the victim. And I think that's fantastically prejudicial.

The judge ruled the anticipated testimony was relevant and admissible but cautioned the State not to elicit from Hessian how the conversation "made him feel." Subsequently, the following exchange occurred during Hessian's direct examination:

> [STATE]: [W]ithout going into any specifics, were you approached in your apartment by anyone who knows James or Jason Dotts?
>
> [HESSIAN]: Yes.
>
> [STATE]: And [who] would that be?
>
> [HESSIAN]: [Their] mother, and two of [their] family members and a neighbor that lived down the way from my apartment.

A-4830-18

[STATE]: And that was after you had been assaulted in your apartment.

[HESSIAN]: Right. Well, it was after I had gotten home from the hospital.

[STATE]: Do you remember how long you had been home from the hospital at that point?

[HESSIAN]: Maybe . . . a day.

[STATE]: Okay. And again, without going into specifics, did they want to talk to you about what happened to you?

[HESSIAN]: Yes.

Because defense counsel objected to the admission of this evidence during the trial, the harmful error standard applies. State v. Bradshaw, 195 N.J. 493, 509 (2008); R. 2:10-2. An evidentiary error will not be deemed "'harmless' if there is a reasonable doubt as to whether the error contributed to the verdict." J.R., 227 N.J. at 417 (citing State v. McLaughlin, 205 N.J. 185, 211-12 (2011)).

N.J.R.E. 403 provides relevant evidence may be excluded "if its probative value is substantially outweighed by the risk of: (a) [u]ndue prejudice, confusion of issues, or misleading the jury; or (b) [u]ndue delay, waste of time, or needless presentation of cumulative evidence." A trial court has considerable discretion on whether to exclude potentially prejudicial evidence. State v.

McDougald, 120 N.J. 523, 577-78 (1990) (citing State v. Allison, 208 N.J. Super. 9, 17 (App. Div. 1985)). An abuse of discretion occurs when admission of the prejudicial evidence "divert[s] jurors 'from a reasonable and fair evaluation of the basic issue[s] of guilt or innocence.'" State v. Moore, 122 N.J. 420, 467 (1991) (quoting State v. Sanchez, 224 N.J. Super. 231, 249-50 (App. Div. 1988)).

Guided by these principles and given that Hessian offered no testimony about what defendants' family members said to him or how he responded to them, we are not persuaded admission of this evidence constituted harmful error.

Jason also contends Hessian's testimony about defendants' family members should have been excluded under N.J.R.E. 404(b), as other crime or bad act evidence. This argument is misplaced.

N.J.R.E. 404(b) provides that "[e]vidence of other crimes, wrongs or acts is not admissible to prove a person's disposition . . . to show that on a particular occasion the person acted in conformity with such disposition." "However, if that evidence is offered to prove other facts in issue such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, it may be admissible subject to a weighing of the probative value against its

apparent prejudice." State v. Barden, 195 N.J. 375, 388 (2008) (citing State v. Stevens, 115 N.J. 289, 300 (1989)).

Other crime evidence should not be used to bolster the credibility of a witness testifying against the defendant. State v. P.S., 202 N.J. 232, 256 (2010) (citing State v. Darby, 173 N.J. 509, 520 (2002)). "[U]nder N.J.R.E. 404(b), the party seeking to admit other-crimes evidence bears the burden of establishing that the probative value of the evidence is not outweighed by its apparent prejudice." State v. Reddish, 181 N.J. 553, 608-09 (2004) (citing State v. Long, 173 N.J. 138, 162 (2002)).

The Cofield Court articulated the following four-prong test to guide the determination of when to admit such evidence:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and
>
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [Barden, 195 N.J. at 389 (citations omitted) (quoting Cofield, 127 N.J. at 338).]

The Cofield analysis is intended to reduce the underlying danger that the factfinder may convict a defendant because "he or she is a 'bad person' who must be guilty of the crime charged." State v. Castagna, 400 N.J. Super. 164, 175 (App. Div. 2008) (citations omitted). "Because of the damaging nature of such evidence, the trial court must engage in a 'careful and pragmatic evaluation' of the evidence to determine whether the probative worth of the evidence is outweighed by its potential for undue prejudice." Barden, 195 N.J. at 389 (quoting Stevens, 115 N.J. at 303).

Here, there is no evidence defendants' family said anything criminal or even improper to Hessian. Moreover, no member of the family testified at trial. Nor did the limited testimony from Hessian about defendants' family members show that either defendant was disposed toward criminal or bad conduct, as N.J.R.E. 404(b) seeks to prevent. Additionally, nothing in the record indicates either defendant instructed family members to speak to Hessian. Accordingly, we perceive no error in the judge permitting the challenged testimony.

Jason's and James's Point IV Arguments

Each defendant urges us to reverse his convictions based on the judge allowing Hessian to testify about his military service and injuries. Jason further contends the assistant prosecutor improperly stated in summation that Hessian

42

occupied a "position of trust" with defendants, and they "t[ook] advantage" of him.

Because James's attorney advised the judge pretrial she did not "have any objection to informing" the jury Hessian was a military veteran and she did not object to the challenged remarks in the State's summation, and because neither defendant objected to Hessian's testimony when he stated he was wounded during his military service and qualified for disability, we review defendants' contentions for plain error. R. 2:10-2.

As we have mentioned, a trial court "has broad discretion in determining the admissibility of potentially prejudicial evidence." State v. Scherzer, 301 N.J. Super. 363, 424 (App. Div. 1997) (citing State v. Wilson, 135 N.J. 4, 20 (1994)). Absent a clear abuse of discretion, we will not overturn the decision unless it was "so wide of the mark that a manifest denial of justice resulted." Ibid. (citing State v. Carter, 91 N.J. 86, 106 (1982)).

"[T]he fundamental obligation of those representing the State in criminal prosecutions is not to convict, 'but to see that justice is done.'" State v. Williams, 244 N.J. 592, 607 (2021) (quoting State v. Frost, 158 N.J. 76, 83 (1999)). Prosecutors are prohibited from including in their opening statements inflammatory comments to generate sympathy for the victim or animosity

43                                                                    A-4830-18

toward the defendant.  See State v. W.L., Sr., 292 N.J. Super. 100, 108 (App. Div. 1996).  A prosecutor's duty to refrain from improper methods that result in wrongful conviction extends to the examination and cross-examination of witnesses.  A prosecutor may not elicit improper or inflammatory testimony from a witness.  See McGuire, 419 N.J. Super. at 140-42.

Prosecutors have considerable leeway in summarizing the State's case, State v. Williams, 113 N.J. 393, 447 (1988), and may do so "graphically and forcefully," State v. Johnson, 287 N.J. Super. 247, 265 (App. Div. 1996) (quoting State v. Pratt, 226 N.J. Super. 307, 323 (App. Div. 1988)).  They may not, however, make "inflammatory and highly emotional" appeals that have the capacity to distract the jury from a fair consideration of the evidence of guilt. W.L., Sr., 292 N.J. Super. at 111 (quoting State v. Marshall, 123 N.J. 1, 161 (1991)).  The prosecutor must confine his or her comments to the evidence and the reasonable inferences that may be drawn therefrom.  Johnson, 287 N.J. Super. at 265 (citing State v. Smith, 27 N.J. 433, 460 (1958)).  A conviction may be reversed where the prosecutor engaged in conduct so egregious in the context of the trial as a whole that defendant was deprived of a fair trial.  State v. Wakefield, 190 N.J. 397, 437-38 (2007) (citing State v. Papasavvas, 163 N.J. 565, 625 (2000)).

Here, the record reflects Hessian's military service was mentioned briefly in the State's opening remarks and again in Hessian's testimony, but only in conjunction with his eligibility for disability payments. The assistant prosecutor made no mention of Hessian's veteran status in summation but did fleetingly refer to how Hessian trusted defendants.

We are satisfied Hessian's brief testimony about his military service and disability simply made clear defendants knew when Hessian would have received his monthly disability payment and established their knowledge of Hessian's vulnerability on the date of the attack. Thus, we are convinced his testimony was not unduly prejudicial. Also, we are persuaded the assistant prosecutor's closing remarks constituted legitimate inferences from the facts, id. at 457, considering she confined her comments to the evidence and stayed within the wide latitude to which she was entitled, State v. Mayberry, 52 N.J. 413, 437 (1968) (citations omitted). Accordingly, the judge committed no error, let alone plain error in admitting the challenged testimony, and we reject the notion the State's closing remarks raise "a reasonable doubt as to whether [the comments] led the jury to a verdict it might not have [otherwise] reached." State v. Bankston, 63 N.J. 263, 273 (1973) (citing State v. Macon, 57 N.J. 325, 335-36 (1971)).

Jason's Point V Argument

Jason newly contends he was denied his right to a fair trial because Detective Romano implied in his testimony that defendants lied during their police interviews. The challenged testimony occurred after James's attorney asked during the detective's recross-examination, "if Jason said he took [his insurance paperwork] with him, then you wouldn't expect to find it in [Hessian's] apartment; is that fair?"; the detective answered:

> No. They told me . . . a lot of different stories from the beginning. If he told me that he took it after an hour's worth of essentially lying to me, no, I wouldn't believe that he would have taken his paperwork; or I . . . could safely say he might not be telling me the truth.

Neither defendant objected to this testimony. Therefore, the issue raised is one of plain error. Macon, 57 N.J. at 336; R. 2:10-2.

A police officer testifying as a fact witness is not permitted to offer an opinion as to a defendant's guilt or innocence, directly or by "necessary inference." State v. Frisby, 174 N.J. 583, 593-94 (2002). Police testimony concerning a defendant's guilt or veracity is prejudicial because a jury "may be inclined to accord special respect to such a witness." Neno v. Clinton, 167 N.J. 573, 586-87 (2001).

46

In State v. C.W.H., 465 N.J. Super. 574, 592-96 (App. Div. 2021), we found plain error where the interviewing detective testified on three occasions that the defendant's denials were "very weak" and "they were some of the weakest denials I've seen in an interview." The detective also stated "this" was a "textbook interview of somebody being deceptive throughout the . . . entire interview." Id. at 592. We concluded the detective's testimony "clearly conveyed the impression to the jury that defendant was being deceptive during questioning, [and] impermissibly colored the jury's assessment of defendant's credibility." Id. at 595.

That is not the case here. In fact, Detective Romano's statement that defendants told him a "lot of different stories" was not an impermissible observation because, as a factual matter, they did tell different stories when questioned about the incident, as evidenced by their interview statements.

To the extent the detective indicated Jason was "essentially lying" to him for over an hour, we discern no plain error in the admission of this testimony, which, as noted, was elicited by the defense. Unlike the scenario in C.W.H., here the detective made a single reference to Jason "lying." Moreover, the assistant prosecutor did not refer to defendants' "lies" in her summation. She simply described "all the different versions of events" defendants gave, and

"how at the end they don't match." This was fair comment on the evidence and not improper. In addition, the detective's challenged testimony was limited to Jason's insurance paperwork, not to the crimes themselves. Therefore, Detective Romano's reference to defendants "lying" was not clearly capable of producing an unjust result.

James's Point V Argument

We need not discuss at length James's contention that even if none of his arguments separately warrants reversal of his conviction, he has established cumulative error to justify reversal.

A defendant is not entitled to a perfect trial. Wakefield, 190 N.J. at 537. Only when "legal errors are of such magnitude as to prejudice the defendant's rights or, in their aggregate, have rendered the trial unfair," the defendant will be entitled to a new trial. State v. Orecchio, 16 N.J. 125, 129 (1954). Suffice it to say, because James failed to demonstrate harmful error under Points I through IV, we discern no cumulative error warranting reversal. See State v. Weaver, 219 N.J. 131, 155 (2014).

Jason's and James's Point VI Arguments

Finally, defendants argue their sentences are excessive. Jason contends his fifteen-year prison sentence is excessive because the judge failed to utilize the correct sentencing range when imposing an extended sentence; James argues his fifteen-year term is excessive because the judge double-counted aggravating factors. James also points to the jury's acquittal on the robbery charge and contends the judge erred in not finding the mitigating factor that James did not contemplate serious harm to Hessian. Further, James argues the judge erred in not considering Kirkpatrick's limited jail sentence during James's sentencing. None of these arguments are persuasive.

In reviewing a sentencing determination, we must determine whether the findings of fact on the aggravating and mitigating factors were based on competent and credible evidence in the record, whether the judge applied the correct sentencing guidelines enunciated in the Code, and whether the application of the facts to the law constituted such an error of judgment as to shock the judicial conscience. State v. Roth, 95 N.J. 334, 363-65 (1984).

Here, the judge sentenced Jason to an extended term; but he first found Jason was a persistent offender, noting Jason was thirty-nine when he committed his crimes, had six prior convictions, and his latest conviction was well within

ten years of his present offenses. Similarly, the judge deemed James a persistent offender and eligible for an extended-term sentence because he was thirty-nine when the offenses were committed, had nine prior convictions, including two aggravated assault convictions, and James's most recent conviction was within the requisite ten-year period.

In his aggravating and mitigating factor analyses, the judge found aggravating factors two (gravity and seriousness of harm inflicted), three (risk of re-offense), six (criminal history), nine (need to deter), and twelve (the offense was against a person the defendant knew or should have known was sixty years of age or older, or disabled), N.J.S.A. 2C:44-1(a)(2), (3),(6) (9) and (12), applied to each defendant. Further, the judge determined no mitigating factors applied.

During his aggravating and mitigating factor analysis at Jason's sentencing, the judge found Jason knew or should have known Hessian was particularly vulnerable due to his physical and psychological disability; aggravating factor three applied because Jason "began his criminal career immediately upon turning [eighteen] and really hasn't let up, despite stints both in . . . [p]rison" and the county jail, as well as "probation supervision"; aggravating factors six and nine were implicated because of Jason's lengthy

criminal record and the need to deter him; and aggravating factor twelve applied because Jason knew Hessian was disabled. Further, the judge found there were "no mitigating factors," "this was a particularly cruel case," and Hessian was left "alone in his apartment after [defendants] beat[] him for a small amount of money." Additionally, the judge determined, "[t]his was clearly a plan between three individuals and they executed that plan." The judge stated he was "clearly convinced that the aggravating factors . . . substantially outweigh the [non-existent] mitigating factors."

When the judge examined the aggravating and mitigating factors applicable to James, his analysis was similar. But at James's sentencing, the judge gave aggravating factors two and twelve "significant weight." Further, he declined to find any mitigating factors, including mitigating factor two, as James requested, stating, "[w]hen you engage in a conspiracy and a plan to rob someone, I cannot find that this defendant did not intend for harm to result. . . . [T]he harm that resulted lies at the feet of both co-defendants." Also, the judge stated he was "clearly convinced . . . the aggravating factors . . . very substantially outweigh[ed] the [non-existent] mitigating factors."

Upon application of the prosecutor, a trial court may impose an extended term on persons convicted of crimes of the first, second, or third-degree if it

finds the defendant is a persistent offender. N.J.S.A. 2C:44-3(a). Once the criteria for a persistent offender are met, "the range of sentences, available for imposition, starts at the minimum of the ordinary-term range and ends at the maximum of the extended-term range." State v. Pierce, 188 N.J. 155, 169 (2006). Therefore, a persistent offender convicted of a second-degree crime, such as aggravated assault, may be sentenced to an extended term of between ten and twenty years. N.J.S.A. 2C:43-7(a)(3). The choice of a sentence within that range is within the trial court's "sound judgment," and will be reviewed for an abuse of discretion. Pierce, 188 N.J. at 169-70.

If the trial court decides to impose an extended sentence, it must weigh the aggravating and mitigating factors to determine the base term of the extended sentence, and then whether to impose a period of parole ineligibility. State v. Dunbar, 108 N.J. 80, 88-89 (1987). In deciding whether to impose a parole ineligibility period on an extended term, the court must be "clearly convinced that the aggravating factors substantially outweigh the mitigating factors." Id. at 92 (quoting N.J.S.A. 2C:43-6(b)).

Jason argues the court incorrectly viewed the sentencing range as ten to twenty years, although it actually was five to twenty years, consistent with the holding in Pierce. We are not convinced.

52

Before the judge sentenced Jason, he stated Jason was

> clearly eligible for sentencing as a persistent offender pursuant to [N.J.S.A.] 2C:44-3(a). The State's motion for an extended term as to Count [Two], second-degree aggravated assault, is granted. And pursuant to [N.J.S.A.] 2C:43-7(a)(3), the <u>defendant will be sentenced to Count [Two] within the first-degree range of [ten] to [twenty] years</u>. And I will sign the order to that effect.
>
> [(Emphasis added).]

After granting the State's extended-term motion, the judge balanced the State's request for a seventeen-year sentence on Jason's aggravated assault conviction against defense counsel's request for a lower term. In that vein, both Jason's attorney and the judge cited <u>Pierce</u>. As the sentencing progressed, defense counsel conceded Jason had "the opportunity to plea bargain this case . . . to a [five]-year sentence," but given the jury's verdict, "the sentencing . . . will be in [the court's] hands." Importantly, Jason's attorney also stated, "<u>I think the low end of the first-degree [range] would be more than appropriate to </u>sentence him to under all of the circumstances of this particular case. <u>So, that's my position for you</u>." (Emphasis added).

The record also reflects that at Jason's sentencing, the judge stated,

> <u>the extended[-]term range </u>. . . on a second-degree [offense] <u>is elevated to [ten] to [twenty]</u> years . . . . [with t]he <u>methodology to be employed []as set forth</u>

53

originally in . . . <u>Dunbar</u>, 108 N.J. at 80 . . . and . . . <u>modified by the Supreme Court in . . . Pierce</u>, 188 N.J. at 155.

[(Emphasis added).]

He subsequently found Jason should "be sentenced [on] Count 2 <u>within the first-degree range of [ten] to [twenty] years</u>," and that a fifteen-year term was appropriate because the "<u>second-degree offense [was] treated as a first-degree offense for purposes of sentencing</u>." (Emphasis added).

Under these circumstances, where Jason's attorney did not argue for a sentence below ten years but argued in favor of the "low end of the first-degree [range]," the judge found the aggravating factors substantially outweighed the non-existent mitigating factors, and nothing in the record suggests the judge was unaware a sentence below ten years was permissible, the judge's imposition of a fifteen-year sentence was not an abuse of discretion.

Regarding James's excessive sentence argument, he claims the court improperly double-counted aggravating factors when finding aggravating factors two and twelve, despite that both factors cover the vulnerability of the victim. However, these factors are not identical. N.J.S.A. 2C:44-1(a)(2) refers to a victim's injuries, in part, and covers the "gravity and seriousness of the harm inflicted on the victim, including whether or not the defendant knew or

54

reasonably should have known that the victim of the offense was particularly vulnerable or incapable of resistance due to . . . ill-health." But N.J.S.A. 2C:44-1(a)(12) is applicable when the defendant "knew or should have known" the victim "was . . . disabled." James cites to no authority, nor are we aware of any, precluding a judge from finding both factors. Moreover, here, considering Hessian's circumstances and the nature of the assault against him, the judge's finding of these factors is amply supported by the record.

James also argues the judge erred in finding aggravating factors three and six. This argument is completely devoid of merit. R. 2:11-3(e)(2). Further, James contends the judge improperly considered his criminal record to sentence him as a persistent offender. He cites State v. Vasquez, 374 N.J. Super. 252, 269-70 (App. Div. 2005), where we held the trial court erred in sentencing the defendant to an extended term after finding aggravating factors "that arguably go beyond defendant's criminal record." James's argument is misplaced.

As the Court explained in State v. Tillery, 238 N.J. 293, 327-28 (2019), no error is committed by the trial court when relying on the defendant's criminal record both to determine the defendant was a persistent offender and to support the findings of aggravating factors three and six. See also State v. McDuffie, 450 N.J. Super. 554, 576-77 (App. Div. 2017) (rejecting the defendant's claim

the sentencing court impermissibly doubled-counted his criminal record when it granted the State's motion for a discretionary extended term, and again when imposing aggravating factor six).

Next, James argues the judge erred in not finding mitigating factor two, i.e., that James did not contemplate serious harm. He cites his acquittal on the robbery charge to support his argument. However, James's argument ignores he was found guilty of aggravated assault, which necessarily involved causing bodily injury. Therefore, his argument lacks merit. R. 2:11-3(e)(2).

Finally, James contends the judge erred in finding Kirkpatrick's one-year sentence "irrelevant" to the sentencing determination. Citing State v. Hicks, 54 N.J. 390, 391-92 (1969), James maintains the leniency Kirkpatrick received at sentencing should have resulted in James receiving a more lenient sentence. Again, we disagree.

In Hicks, the Court noted "grievous inequities in sentences destroy a prisoner's sense of having been justly dealt with, as well as the public's confidence in the even-handed justice of our system." Id. at 391. But it also recognized "a sentence of one defendant not otherwise excessive is not erroneous merely because a codefendant's sentence is lighter." Ibid. (citations omitted). Also, the Court has instructed, when a court considers imposing

disparate sentences, it "must determine whether the co-defendant is identical or substantially similar to the defendant regarding all relevant sentencing criteria." State v. Roach, 146 N.J. 208, 233 (1996).

Here, James fails to demonstrate he and Kirkpatrick were "substantially similar" regarding all relevant sentencing criteria. For instance, Kirkpatrick was convicted of a less serious offense. He also cooperated with the State to secure the benefit of his plea bargain, so he was entitled to a finding of mitigating factor twelve, N.J.S.A. 2C:44-1(b)(12); this was not the case for James, who chose to proceed to trial, as was his right. Moreover, there is no evidence Kirkpatrick had a criminal history akin to James's lengthy criminal record. Therefore, we cannot conclude the judge erred by disregarding Kirkpatrick's sentence when he sentenced James.

In sum, we perceive no basis to disturb defendants' convictions or sentences. To the extent we have not addressed defendants' remaining contentions, we are persuaded they lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

57

A-4830-18